**Reversed and Rendered and Memorandum Opinion filed August 1, 2013.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-11-00881-CV

**LEXINGTON INSURANCE COMPANY, Appellant**

**V.**

**JAW THE POINTE, LLC, Appellee**

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 09-CV-1238**

## M E M O R A N D U M   O P I N I O N

In this insurance dispute, Lexington Insurance Company ("Lexington") challenges a judgment in favor of JAW The Pointe, LLC ("The Pointe"). Lexington asks this court to reverse the trial court's judgment on grounds that (1) Lexington cannot be liable for statutory bad faith because it did not breach the insurance policy; (2) the evidence is legally and factually insufficient to support the jury's liability findings; (3) Lexington is entitled to a settlement credit that exceeds the amount of the judgment; (4) there is legally and factually insufficient

evidence to support the actual damages awarded to The Pointe; (5) the trial court erred by awarding The Pointe additional damages based on a jury finding of knowing conduct; and (6) The Pointe is not entitled to attorney's fees because Lexington is not liable for statutory bad faith. Because we conclude there is no coverage under the policy at issue, we reverse the trial court's judgment and render judgment in favor of Lexington.

## Factual Background

Emery Jakab and several partners formed JAW The Pointe, LLC and then purchased an apartment complex in July 2007 for approximately $5.7 million. The apartment complex consisted of 13 two-story buildings and was located next to the seawall in Galveston.

The Pointe purchased insurance from Lexington and other insurance companies under a group program that provided coverage to hundreds of unrelated apartment complexes in multiple states. The named insured under the Lexington policy is Nations Asset Management LP (CAT), an entity comprising approximately 300 apartment complexes including The Pointe's Galveston property. The apartment complexes constituting Nations Asset Management were brought together by an insurance broker, Southwest Risk, and a retail agent, Commercial Insurance Solutions, which acted on behalf of The Pointe and the other apartment complexes.

The Lexington policy was one of several layers that collectively provided insurance coverage up to $100 million for the Nations Asset Management properties. Lexington's was the primary policy and provided $25 million in coverage per occurrence under the group program. Max Specialty Insurance Company was the first excess layer, providing $15 million in coverage above Lexington's $25 million. The next layer was Essex Insurance Company, which

2

provided $10 million in coverage above the $40 million provided by Lexington and Max Specialty. Several additional layers of insurance also were in place up to $100 million in coverage. According to trial testimony, The Pointe's ownership recognized that there might not be sufficient coverage under the group program if a hurricane or some other catastrophic event occurred.

Hurricane Ike hit Galveston on September 13, 2008, causing damage to The Pointe's apartment complex and about 135 other apartment complexes encompassed by the Nations Asset Management insurance program. The Pointe hired a public insurance adjusting firm, Adjusters International, to assist The Pointe during the insurance claims settlement process. Adjusters International assigned Hal Arnold to be The Pointe's public adjuster.

Insurance broker Southwest Risk, on behalf of the insured Nations Asset Management, chose Cunningham Lindsey to serve as Lexington's adjuster; Lexington approved this choice. Cunningham Lindsey was paid by Lexington and reported to Iolanda Mestre-Gonzalez, whom Lexington had assigned to be the claims examiner for claims made by The Pointe and other apartment complexes constituting Nations Asset Management. Cunningham Lindsey was not authorized to make coverage decisions or make payments; this authority was reserved to Lexington. Cunningham Lindsey appointed Paul Odom and John Jay as adjusters to work on The Pointe's claim. Lexington also hired a building consultant, Unified Buildings Services, to prepare damages estimates.

The Pointe initially intended to repair the apartment complex; its plans changed when Jakab attended a meeting with planning officials from the City of Galveston and members of the Galveston County Apartment Association on October 13, 2008. City officials explained that apartment owners would be required to demolish and rebuild to comply with current code requirements if the

3

City determined that an apartment complex's damages exceeded 50 percent of the complex's market value.

The Pointe contacted the City's Planning Office by e-mail on October 28, 2008, advising the City that (1) it would submit a building permit application to repair its apartment complex; and (2) the damage estimates were "far in excess of the 50% of the appraisal district's valuation of improvements plus 5%." The Pointe asked the City to confirm that it would deny The Pointe's permit application to repair and require that the apartment complex be rebuilt to current code requirements, which included raising the buildings to 11 feet. Emery Jakab, who testified at trial on behalf of The Pointe, could not recall receiving a response to this request from the City.

The Pointe submitted a building permit application on November 12, 2008, to repair the apartment complex. The permit application stated that the repair would cost $6,256,887. The Pointe supported this figure with an estimate it obtained from Camp Construction Services.

Mestre-Gonzalez reviewed The Pointe's claim file and made her first entry on November 13, 2008. She noted that The Pointe's loss could reach $8 million based on The Pointe's total insured value if the City required The Pointe to demolish and rebuild the apartment complex in compliance with code requirements. Mestre-Gonzalez believed at the time that $8 million would be the maximum The Pointe could recover because she erroneously assumed that loss from flood was covered under the Lexington policy. The Pointe submitted a sworn proof of loss to Lexington on November 14, 2008, requesting a $300,000 advance or partial payment toward business income loss, and Lexington paid the amount requested.

The City sent The Pointe a letter on December 19, 2008, informing The

4

Pointe that it had inspected the apartment complex and determined that the complex was "substantially damaged" by Hurricane Ike. The City further stated that "[a] substantially damaged structure is one that has damage that equals or exceeds 50 percent of the market value of the structure. According to the City approved property value formula, the market value of [The Pointe's apartment complex is] $2,247,924.00 (current appraised value plus 5%)." The City informed The Pointe that to "ensure that your future flood risk is reduced, your structure must be brought into compliance with local flood damage reduction regulations. Please contact the City of Galveston Building Division to discuss options for bringing the structure into compliance and to obtain applicable permits to begin work." The Pointe informed Cunningham Lindsey of the City's letter through Hal Arnold on December 22, 2008. Mestre-Gonzalez received the City's letter in January 2009.

The Pointe concluded it had to demolish and rebuild the apartment complex because it could not elevate the existing buildings to 11 feet as required by City building regulations; it hired architect Michael Gaertner and general contractor Davis Brothers Construction to start the rebuilding process. The Pointe's public adjuster, Arnold, informed Cunningham Lindsey by letter on February 27, 2009, that The Pointe incurred $600,000 in demolition and other costs and "is making a formal claim for the ordinance or law coverage afforded under the policy." The Pointe also incurred expenses toward the rebuilding of the apartment complex, including expenses for architectural and permitting fees.

The Lexington policy contains two endorsements under which an insured can recover in certain circumstances for demolition and rebuilding costs resulting from an insured's obligation to comply with ordinances. The first endorsement is titled "Ordinance or Law Coverage," and the second is titled "Demolition and

5

Increased Cost of Construction." The parties refer to the former as the "Ordinance" endorsement and the latter as the "DICC" endorsement.

Lexington received an estimate in April 2009 from its building consultant, Unified Buildings Services, regarding damages to The Pointe's apartment complex. The estimate for damage from wind was $1,278,000; the estimate for damage from flood was $3.5 million. Arnold and Unified Buildings Services agreed that the damage from wind amounted to $1,278,000. The Pointe signed and submitted to Lexington a sworn statement of proof of loss on May 5, 2009, requesting payment for the "whole loss and damage" of $1,278,001.33 minus the applicable deductible of $460,060.39 for a total of $817,940.94. The Pointe received a check from Lexington for the requested amount shortly after submitting the proof of loss.

The Pointe claimed that it did not receive a formal letter from Lexington denying the remainder of its insurance claim or providing an explanation of Lexington's coverage determinations regarding the two policy endorsements. Instead, The Pointe claimed that Cunningham Lindsey adjuster Odom informed Arnold during a telephone conversation on July 15, 2009, that Lexington had determined that The Pointe's claim was not covered under the Ordinance endorsement because Lexington believed "all the damages were caused by flood."

**Procedural Background**

The Pointe sued Lexington, Cunningham Lindsey, Odom, and Jay on July 19, 2009, alleging claims for (1) breach of contract, violations of the Texas Insurance Code, violations of the Texas Deceptive Trade Practices Act, and bad faith against Lexington; and (2) violations of the Texas Insurance Code and violations of the Texas Deceptive Trade Practices Act against Cunningham Lindsey, Odom, and Jay.

6

Cunningham Lindsey and Lexington continued to work on The Pointe's claim after The Pointe filed suit. Lexington sent a letter to The Pointe in September 2009; according to Mestre-Gonzalez, "[t]he letter said flood wasn't covered. It explained why law and ordinance wasn't covered. And it gave a brief synopsis of what had happened to that point." Lexington also continued paying claims that other property owners of the Nations Asset Management group had submitted to Lexington. Lexington informed The Pointe by letter that the $25 million primary policy had been exhausted in January 2010. Lexington also informed The Pointe that Max Specialty Insurance Company was the next layer of insurance and provided The Pointe with Max Specialty's contact information.

The Pointe filed its second amended petition on March 19, 2010, alleging that its apartment complex sustained extensive damage caused by wind and water and seeking damages for (1) breach of contract, violations of the Texas Insurance Code, violations of the Texas Deceptive Trade Practices Act, and bad faith from Lexington, Max Specialty Insurance Company, and Essex Insurance Company; and (2) violations of the Texas Insurance Code and violations of the Texas Deceptive Trade Practices Act from Cunningham Lindsey, Odom, and Jay.

The Pointe filed a motion to dismiss its claims against Max Specialty Insurance Company with prejudice on February 18, 2011, alleging that the parties had resolved their dispute; the trial court granted the motion on February 28, 2011. On March 9, 2011, The Pointe filed a motion for partial nonsuit with prejudice, asking the trial court to dismiss its claims against Cunningham Lindsey, Jay, and Odom; the trial court granted the motion on March 14, 2011. The Pointe also filed a motion to dismiss its claims against Essex Insurance Company with prejudice on March 11, 2011, alleging that the parties had resolved their dispute; the trial court granted the motion on March 15, 2011.

Lexington filed a motion for partial summary judgment on March 14, 2011, arguing that The Pointe's breach of contract claim must fail because Lexington discharged its obligations to The Pointe when it paid out the full policy limit. On the same day, Lexington filed a separate motion for partial summary judgment arguing that The Pointe's claim for flood coverage should be dismissed because flood coverage is unambiguously excluded under the insurance policy. The trial court granted both summary judgment motions on April 5, 2011.

A jury trial was held from April 18, 2011 to April 28, 2011. The case was submitted to the jury to determine various Insurance Code violations asserted by The Pointe. The jury returned a verdict in The Pointe's favor and made several factual findings. In Question No. 1, the jury found that Lexington had engaged in "unfair or deceptive acts or practices in the business of insurance that w[ere] a producing cause of damages to" The Pointe by: failing to "attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability had become reasonably clear;" failing to promptly provide a reasonable explanation for the denial of a claim; and failing to affirm or deny coverage within a reasonable time. The jury answered "No" when asked whether Lexington refused to pay claims without conducting a reasonable investigation of the claim, or whether it compelled The Pointe to file a lawsuit to recover "amounts due under their policy by offering substantially less than the amounts" received.

Based on Lexington's conduct found in Question No. 1, the jury awarded The Pointe damages in Question No. 2 for repair or replacement of The Pointe's property covered under the Ordinance and DICC endorsements in the amount of $1,200,000, and for reasonable and necessary expenses, other than attorneys' fees, in the amount of $30,000. In Question No. 3, the jury determined that Lexington knowingly engaged in the actionable conduct and awarded The Pointe $2,500,000

in additional damages in Question No. 4. In response to Question No. 5, asking whether Lexington received all items, statements, and forms reasonably requested and required by Lexington to secure final payment of loss, the jury answered "No." Finally, the jury awarded The Pointe $170,000 in attorney's fees in Question No. 7.

The Pointe did not challenge the jury's findings post-verdict and filed a motion to enter judgment on May 25, 2011. Lexington filed a motion to disregard certain jury findings and requested a take nothing judgment on June 1, 2011. The trial court signed a judgment based on the jury verdict on July 7, 2011. Lexington filed its motion for new trial on August 5, 2011, asking the trial court to set aside the jury's answers, vacate its judgment, and order a new trial. On the same day, Lexington also filed a motion for judgment notwithstanding the verdict or, alternatively, a motion to modify the judgment. The motion for new trial was overruled by operation of law, and the motion to disregard was denied by implication. *See Chilkewitz v. Hyson*, 22 S.W.3d 825, 828 (Tex. 1999); Tex. R. App. P. 33.1(a)(2)(A). Lexington filed a timely appeal on October 4, 2011.

**Analysis**

**I.     Insurance Code Violations**

In its first issue, Lexington argues that the evidence is legally insufficient to support the jury's findings of liability for Insurance Code violations. Lexington contends that: (1) it paid out the full limits of its policy; (2) The Pointe failed to submit a sworn proof of loss to support its claim under the policy's endorsements; (3) The Pointe's alleged loss was not a covered loss under the policy's endorsements; and (4) The Pointe did not demolish or rebuild its property before the policy limits were exhausted, which was a requirement to trigger coverage under the policy endorsements.

9

As a general rule, Texas does not recognize a claim for bad faith when an insurer denies a claim that is not covered under the insurance policy. *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). And, generally speaking, extra-contractual claims do not survive when the issue of coverage is resolved in the insurer's favor. *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010); *see Stoker*, 903 S.W.2d at 341. The Texas Supreme Court has not excluded "the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim." *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005); *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2002).

In light of this precept, we begin our analysis by addressing whether The Pointe's unpaid loss was covered under the insurance policy because this determination is dispositive of Lexington's first issue and impacts the remaining issues in this case.

## A. Coverage Overview

In determining whether Hurricane Ike-related damage to The Pointe's apartment complex is a covered loss under the policy's Ordinance or DICC endorsements, it is helpful to begin with a review of the general policy language and its interplay with the specific policy endorsements at issue.

Insurance policies are contracts, and we construe them using ordinary rules of contract interpretation. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009). We give policy language its plain, ordinary meaning unless something else in the policy shows the parties intended a different, technical meaning. *Id.* When construing the policy's language, we must give effect to all contractual provisions so that none will be rendered meaningless. *Kelley–*

*Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998); *see Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 253 (Tex. 2009).

The Lexington policy contains several declarations on its first page. These include the named insured; the policy period; insurance limits; a "Description of Property Covered" that includes "real and personal property, business interruption, extra expense, debris removal," and DICC; and a reference to "Forms Attached" that affect coverage.

The policy's "Building and Personal Property Coverage Form" provides under section "A. Coverage" that Lexington "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Section A.3 titled "Covered Causes of Loss" and section B. titled "Exclusions" instruct the reader to "See applicable Causes of Loss Form as shown in the Declarations."

In turn, the attached "Causes of Loss – Special Form"[1] provides as follows:

CAUSES OF LOSS – SPECIAL FORM

A. COVERED CAUSES OF LOSS

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

  1. Excluded under Section B., Exclusions; or

  2. Limited in Section C., Limitations;

  that follow.

B. EXCLUSIONS

---

[1] We reject The Pointe's contention that the Causes of Loss-Special Form is not part of the Lexington policy because the "Declarations for this policy does not list 'Special.'" The Declarations page states "Forms Attached: See attached forms schedule." The forms in turn include the "Causes of Loss-Special Form;" therefore, the Declarations page captures the Causes of Loss-Special Forms.

11

1. We will not pay for loss or damage caused directly or indirectly by any of the following. ***Such loss or damage is excluded regardless of any other causes or event that contributes concurrently or in any sequences to the loss.***

   a. Ordinance or Law

   The enforcement of any ordinance or law:

   1) Regulating the construction, use or repair of any property; or

   2) Requiring the tearing down of any property, including the cost of removing debris.

   \*                 \*                 \*

   g. Water

   1) Flood . . . .

(emphasis added). The highlighted concurrent causation language means that a loss is excluded from coverage when it results from a combination of covered and uncovered causes of loss. *See ARM Props. Mgmt. Group v. RSUI Indem. Co.*, 400 Fed. App'x 938, 941 (5th Cir. 2010); *see also Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 160 (Tex. 2003) ("[A]n exclusion's purpose is to remove from coverage an item that would otherwise have been included. . . . Absence of an exclusion cannot confer coverage.") (citation omitted).

The policy also contains separate endorsements for "Ordinance or Law Coverage" and "Demolition and Increased Cost of Construction." The "Ordinance or Law Coverage" endorsement effectively removes the Ordinance exclusion under Section B. of the Causes of Loss Form. The Ordinance endorsement specifically states that it "modifies insurance provided under the . . . Building and Personal Property Coverage Form." As discussed more fully below, the Ordinance endorsement removes the exclusion for "loss or damage caused by enforcement of any ordinance of law" under certain circumstances. There is no such endorsement for flood; therefore, loss from flood still is excluded from coverage under Section

12

B. of the Causes of Loss Form.  Unsegregated loss from a combination of wind and flood also is excluded.

**B.      Coverage Under the Ordinance and DICC Endorsements**

With this overview in mind, we next apply the policy language in light of the jury charge as submitted to determine whether The Pointe's loss is covered under the Lexington policy.

The jury found in response to Question No. 1 that Lexington engaged in "deceptive acts or practices in the business of insurance that was a producing cause of damages" to The Pointe.  In response to Question No. 2, the jury awarded "Policy benefits for repair or replacement of [The Pointe]'s property due to damage to the property covered under the Demolition and Increased Cost of Construction endorsement or Law and Ordinance endorsement to [Lexington]'s policy."

An insured is not entitled to recover under an insurance policy unless it proves its damages are covered by the policy.  *Emp'rs Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *overruled in part on other grounds by State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696 (Tex. 1996).  When covered and uncovered causes of loss combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered cause of loss. *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  The insured bears the burden to establish coverage.  *All Saints Catholic Church v. United Nat'l Ins. Co.*, 257 S.W.3d 800, 803 (Tex. App.—Dallas 2008, no pet.).  The insured must present some evidence from which the jury can allocate the damage attributable to the covered cause of loss.  *Comsys Info. Tech. Servs.*, 130 S.W.3d at 198.  The insured

13

must segregate the loss caused by the covered cause of loss from the loss caused by the uncovered cause of loss; the failure to segregate covered and uncovered causes of loss is fatal to recovery. *See Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971); *Comsys Info. Tech. Servs.*, 130 S.W.3d at 198; *Wallis v. United Servs. Auto. Ass'n*, 2 S.W.3d 300, 303 (Tex. App.—San Antonio 1999, pet. denied).

Lexington argues that The Pointe's loss is not covered under the policy's Ordinance or DICC endorsements because (1) the policy provides coverage for loss caused by wind; and (2) damage to The Pointe's apartment complex was caused in whole or in part by flood, which is not a covered loss under the policy. According to Lexington, the City's December 2008 determination that The Pointe's apartment complex was "substantially damaged" – and had to be demolished and rebuilt according to City ordinance requirements – does not establish coverage because the City did not segregate between covered wind damage and excluded flood damage in making this determination. The Pointe's November 2008 permit application to the City, which preceded the City's December determination, also did not segregate between covered wind damage and excluded flood damage. Lexington contends that the policy's concurrent cause of loss clause contained in the Causes of Loss-Special Form provides that Lexington "will not pay for loss or damage caused directly or indirectly" by flood. Lexington further argues: "[I]t is undisputed that the City's damages estimate included damages caused by a combination of wind and flood" so that "any loss resulting from the City's requirement that The Pointe be rebuilt in compliance with city codes is not covered" under the policy.

The Pointe responds that the "parties agree that the City determined the ordinance had been triggered and rebuilding was the only way to comply with the

code." The Pointe argues that the "simple question is whether there is some evidence supporting the conclusion that the covered cause of loss – i.e. the hurricane wind and rain damage – was sufficient by itself to cause the losses covered under the DICC and [Ordinance] endorsements." According to The Pointe, evidence in this case "shows that the wind damage from the hurricane was, by itself, sufficient to trigger the ordinances that ultimately created coverage for DICC and [Ordinance]" so that this case does not present a concurrent causation problem.

In that regard, The Pointe argues that the wind damage alone exceeded 50% of the City's market value assessment for the apartments, which was sufficient to trigger the City's December 2008 substantial damage determination and in turn trigger the enforcement of the ordinance. The Pointe emphasizes that (1) Lexington's building consultant, Unified Buildings Services, submitted a damage estimate that calculated damage to The Pointe apartments from wind alone at $1,278,000; and (2) the City's market value assessment for the apartments was $2,400,000.

We disagree with The Pointe's arguments. As explained below, when the Ordinance and DICC endorsements are read together with the Building and Personal Property Coverage Form, demolition and rebuilding costs are covered only if the enforcement is caused by or results from a Covered Cause of Loss. Here, the record does not contain legally sufficient evidence of this causal link.

We first address the Ordinance endorsement, which provides as follows:

A. If a Covered Cause of Loss occurs to covered Building property, we will pay:

　　1. For loss or damage caused by enforcement of any ordinance or law that:

　　　　a. Requires the demolition of parts of the same Property

15

not damaged by a Covered Cause of Loss;

b. Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

c. is in force at the time of loss.

2. The increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance law.

3. The cost to demolish and clear the site of undamaged parts of the property caused by enforcement of the building, zoning or land use ordinance or law.

This endorsement must be read in conjunction with the "Building and Personal Property Coverage Form," which states: "We will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." The endorsement must also be read in conjunction with the concurrent causation clause, which states that "loss or damage caused directly or indirectly" by flood "is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

When read together, these terms provide that Lexington will pay for demolition and increased rebuilding costs that were caused by ordinance enforcement resulting from any "Covered Cause of Loss." Given the concurrent causation clause, demolition and increased rebuilding costs caused by ordinance enforcement resulting from an unsegregated combination of wind and flood damage are not covered. When ordinance enforcement results from a "Covered Cause of Loss," the policy also covers the costs of demolishing and rebuilding portions of the property not damaged by that cause.

Contrary to The Pointe's contention, there must first be some evidence that

(1) a "Covered Cause of Loss" occurred, and (2) the cost to demolish and rebuild The Pointe's apartment complex was caused by ordinance enforcement that resulted from this "Covered Cause of Loss." Here, the record does not contain such evidence.

The Pointe submitted a building permit application to the City on November 12, 2008, for the repair of the damage to the apartment complex. The permit application stated that the repair would cost $6,256,887; it did not contain any allocation for damages caused by wind, flood, or a combination of wind and flood.

The City sent The Pointe a letter on December 19, 2008, in which it stated that it determined The Pointe's apartment complex had been "substantially damaged," meaning that the apartment complex's damage equaled or exceeded 50 percent of the complex's $2,247,924.00 market value. The City informed The Pointe that the complex "must be brought into compliance with local flood damage reduction regulations."

The City did not state whether its December 2008 substantial damage conclusion and resulting ordinance enforcement was based on a determination that the apartment damage was caused by wind alone, which is a "Covered Cause of Loss;" by an unsegregated combination of wind and flood, which is excluded; or by flood alone, which is excluded. The Pointe's November 2008 permit application, which preceded the City's December 2008 letter, was based on an unsegregated combination of wind and flood damage. Nothing in the City's December 2008 letter establishes that the City's enforcement of its ordinance requiring demolition and rebuilding of The Pointe's apartment complex was caused by or the result of a "Covered Cause of Loss."

As evidence of segregation of damage caused by wind versus damage caused by flood, The Pointe relies on the April 2009 estimate of Lexington's

17

building consultant, Unified Buildings Services. But there is no evidence that the City based its December 2008 substantial damage determination on that estimate. The key issue is the actual basis for the City's December 2008 substantial damage determination triggering enforcement of the City ordinance. The Pointe cannot identify any evidence that the City made its substantial damage determination based on wind damage alone — as opposed to flood damage or a combination of wind and flood damage, both of which are excluded causes of loss. Enforcement of the City ordinance predicated in part on an excluded cause of loss is excluded by the policy's concurrent causation language in the Exclusion section of the "Causes of Loss – Special Form."

The parties have not pointed to any evidence that could support a finding that the City's December 2008 substantial damage determination and resulting enforcement of a City ordinance was based on a Covered Cause of Loss. In turn, there is no evidence that the cost to demolish and the increased cost to rebuild was caused by enforcement of an ordinance or law that was triggered by a Covered Cause of Loss. Thus, there can be no coverage for The Pointe's loss under the Ordinance or Law endorsement.

We next address whether The Pointe's loss is covered under the DICC endorsement. The DICC endorsement is similar in nature to the Ordinance endorsement and provides as follows:

> If at the time of any physical loss or damage *insured against by this Policy* there is in force any law or ordinance regulating the construction, repair, replacement or use of buildings or structures then this Policy shall cover as a result of enforcement of such law or ordinance as a direct result of such loss or damage:
>
>> a) the additional loss sustained in demolishing any physically undamaged portion of the buildings or structures;
>>
>> b) the cost incurred in actually rebuilding both the physically

18

> damaged and demolished portions of such buildings or structures with materials and in a manner to satisfy such law or ordinance.
>
> The total liability hereunder shall not exceed the actual expenditure incurred in demolishing the physically undamaged portion of the building(s) or structure(s) involved plus the lesser of the following:
>
> > a) the actual expenditure incurred, not including the cost of land, in rebuilding on another site, or
> >
> > b) the cost of rebuilding on the same site.
>
> This Policy shall not be liable for any cost of demolition or increased cost of reconstruction, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating any form of contamination including but not limited to pollution.
>
> Payment made hereunder shall be subject to the Sublimit of Liability, if any, specified elsewhere in this Policy.

(emphasis added). As written and read in conjunction with the applicable exclusion for any loss caused directly or indirectly by flood, the DICC endorsement provides that the policy covers cost incurred in rebuilding and additional loss sustained in demolishing as a result of enforcement of a law or ordinance as a direct result of any physical loss or damage "insured against by this policy." The scope of physical loss or damage "insured against by this policy" is established by the "Covered Causes of Loss." Under the "Covered Causes of Loss," the policy does not insure against any physical loss or damage caused directly or indirectly by flood "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."

Accordingly, for The Pointe's loss to be covered under the DICC endorsement, there has to be at least some evidence of additional loss sustained in demolishing and cost incurred in rebuilding as a result of enforcement of a law or ordinance based on damage caused by wind — a Covered Cause of Loss. The Pointe presented no such evidence.

19

As discussed above, The City did not state the basis upon which it determined in December 2008 that The Pointe's apartment complex had been "substantially damaged." Nothing in the City's letter shows that the City based its substantial damage determination on a finding that the apartment damage was caused by wind alone, which is a Covered Cause of Loss — rather than by flood or a combination of wind and flood, which are excluded Causes of Loss. Thus, the City's letter does not constitute evidence that the substantial damage finding, which in turn resulted in the enforcement of a City ordinance requiring demolition and rebuilding of The Pointe's apartment complex, was based on a Covered Cause of Loss as required by the DICC endorsement.

The Pointe does not identify any evidence showing the City made its substantial damage determination based on a Covered Cause of Loss. In turn, there is no evidence that there was cost incurred in rebuilding or additional loss sustained in demolishing as a result of enforcement of an ordinance as a direct result of a Covered Cause of Loss. Thus, there can be no coverage for The Pointe's loss under the DICC endorsement.

We conclude that the Lexington policy does not provide coverage for The Pointe's loss under the Ordinance or Law and the DICC endorsements. Having resolved coverage in Lexington's favor, The Pointe's Insurance Code claims cannot survive. *See Page*, 315 S.W.3d at 532; *Stoker*, 903 S.W.2d at 341.

## C.    Extreme Conduct and Failure to Investigate

The Pointe argues that the supreme court "held open two possibilities where a bad faith case could go forward even in the absence of a dispute about whether the claim was covered: (1) where the insurer's conduct was so 'extreme' that it caused some injury other than the loss of the policy benefits; or (2) where the bad

20

faith claim arises out of a duty to timely investigate the insureds' claims."

The Pointe does not contend on appeal that Lexington engaged in extreme conduct, and there is no support in the record for such a contention. Rather, The Pointe argues that it can bring a bad faith claim despite a lack of coverage because Lexington failed to timely investigate its claim. We reject The Pointe's argument for two reasons.

First, the supreme court has stated on several occasions that it "did not exclude the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim." *Boyd*, 177 S.W.3d 922; *Fodge*, 63 S.W.3d at 804. The supreme court has not stated that an insurer's failure to timely investigate an insured's claim may constitute an actionable bad faith claim. *See Boyd*, 177 S.W.3d at 922; *Fodge*, 63 S.W.3d at 804.

Second, in response to Question 1.A., asking whether Lexington refused to pay claims without conducting a reasonable investigation of the claim, the jury answered "No." The Pointe never challenged this jury finding in the trial court or on appeal. The Pointe is therefore bound by the jury's finding. *See OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 21 (Tex. App.—Tyler 2003, pet. denied); *Lawson v. Lawson*, 828 S.W.2d 158, 160 (Tex. App.—Texarkana 1992, writ denied). Accordingly, The Pointe cannot rely on a failure to timely investigate argument to support its bad faith claim in the absence of coverage.

Because there is no coverage for The Pointe's loss under the Ordinance and DICC endorsements of the Lexington policy, and The Pointe has not asserted or shown extreme conduct by Lexington in this case, The Pointe has no viable bad faith claim. We conclude that the issue of coverage is resolved in Lexington's

21

favor, that The Pointe's statutory bad faith claim does not survive, and that Lexington cannot be liable for statutory bad faith in this case.

### D. Bad Faith Damages

The jury awarded The Pointe damages for (1) "Policy benefits for repair or replacement of [The Pointe]'s property due to damage to the property covered under [DICC] endorsement or [Ordinance or Law] endorsement to Lexington's policy" in the amount of $1,200,000; and (2) reasonable and necessary expenses, other than attorney's fees, in the amount of $30,000. The jury also awarded The Pointe additional damages in the amount of $2,500,000 because it found Lexington knowingly engaged in unfair or deceptive acts or practices.

Having concluded that Lexington cannot be liable for bad faith because there is not coverage for The Pointe's loss under the policy, and that Lexington did not engage in extreme conduct, no basis supports the jury's damage awards. *See Chrysler Ins. Co.*, 297 S.W.3d at 254; *Boyd*, 177 S.W.3d at 922. The Pointe is therefore not entitled to recover actual damages or additional damages the jury awarded.

We sustain Lexington's first issue.[2]

## II. Attorney's Fees

Lexington argues in its sixth issue that The Pointe is not entitled to attorney's fees because Lexington is not liable for statutory bad faith. The Pointe responds that the Texas Insurance Code in section 541.152 allows "recovery of reasonable attorneys' fees where the jury finds a violation of the statute."

---

[2] In light of our disposition, we need not address Lexington's second, third, fourth, and fifth issues.

Section 541.152 provides that "A plaintiff who prevails in an action under this subchapter may obtain . . . reasonable and necessary attorney's fees." Tex. Ins. Code Ann. § 541.152(a) (Vernon Supp. 2012). Because The Pointe cannot prevail on its bad faith claim, The Pointe also cannot recover attorney's fees under section 541.152. *See id.*; *Guidry v. Envtl. Procedures, Inc.*, 388 S.W.3d 845, 862 (Tex. App.—Houston [14th Dist.] 2012, pet. filed).

We sustain Lexington's sixth issue.

## Conclusion

Having sustained Lexington's first and sixth issues, we reverse the trial court's judgment and render a take nothing judgment against The Pointe.

/s/    William J. Boyce
Justice

Panel consists of Justices Boyce, McCally and Busby.